**In re GLOSSER BROS., INC., Debtor.**

**In re G.B. HOLDING CORPORATION, Debtor.**

**Bankruptcy Nos. 89–0752, 89–0753. Motion Nos. 89–2240M, 89–2390M, 89–2391M, 89–2350M, 89–2351M, and 89–2503M.**

United States Bankruptcy Court, W.D. Pennsylvania.

June 12, 1989.

See also, Bkrtcy., 100 B.R. 268.

Philip E. Beard, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, Pa., for debtors.

Michael C. McClean, Kirkpatrick & Lockhart, P.C., Pittsburgh, Pa., Applicant for Special Counsel to debtors.

William H. Schorling, Klett, Lieber, Rooney & Schorling, Pittsburgh, Pa., Applicant for Counsel to Unsecured Creditors Committee.

James R. Walsh, Spence, Custer, Saylor, Wolfe & Rose, Johnstown, Pa., Applicant for Counsel to Trade Creditors' Committee.

Dennis J. Spyra, Atty.–Advisor, Office of the U.S. Trustee, Pittsburgh, Pa.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court are several applications for the appointment of professionals in this case, to-wit:

(1) Joint Motion by the Debtors to employ Bear, Stearns & Co., Inc. ("Bear Stearns"), as financial advisor and investment banker (Motion No. 89–2240M);

(2) Motions by the Debtors to jointly employ Kirkpatrick & Lockhart, P.C. ("Kirkpatrick"), as special counsel (Motion Nos. 89–2390M and 89–2391M);

(3) Motions by the Debtors to jointly employ Coopers & Lybrand as accountants and bankruptcy advisors (Motion Nos. 89–2350M and 89–2351M); and

(4) Motion by the Committee of Unsecured Creditors for the employment of Klett, Lieber, Rooney & Schorling, P.C. ("Klett, Lieber") (Motion No. 89–2503M);

The only objector to any of these appointments is the United States Trustee; all other parties have either advised the Court of their acquiescence or have not responded at all.

We are troubled by what we view as potential difficulties, as well as categorical conflicts. The experience in this District with "mega-cases" has been educational if not successful. In each case the professionals have billed and/or received millions of dollars in fees and expenses. None of the more recent cases has produced a confirmed plan, although all have been in Chapter 11 for at least fifteen (15) months. In fact, some have been liquidated; at least one seems doomed to a "hodge podge" of partial liquidation and partial reorganization; still others are making a career of Chapter 11 status. The time is right to take heed from these past cases and tighten the reins on this and future cases.

■ Section 327 of the Code provides the minimum requirements which must be met in order to qualify for appointment as a professional. Specifically, the applicant may not hold an interest which is adverse to the estate, and must be "disinterested", as defined in § 101(13). However, the mere fact that a professional satisfies the technical elements of § 327 does not mandate Court approval. *In re D.L. Enterprises*, 89 B.R. 107 (Bankr.C.D.Calif.1988). The standard to be utilized is whether the appointment will aid in the administration of the proceedings. *Matter of Slack*, 73 B.R. 382 (Bankr.W.D.Mo.1987). The ultimate determination of whether there is a disqualifying conflict *and* whether the representation is in the best interest of the estates falls within the sound discretion of the Court. *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228 (Bankr.E.D.Calif. 1988). We will address each applicant seriatim.

### A. *Bear, Stearns & Co., Inc.*

■ Bear Stearns seeks appointment as exclusive financial advisor and investment banker for the Debtors. The U.S. Trustee has raised numerous objections to this appointment, all of which this Court considered upon receipt of the application.

The objections to this applicant can be divided in two classifications: (1) actual conflict, and (2) estate interests. The Debtors' bankruptcy schedules indicate that Bear Stearns holds in excess of 200,000 shares of common stock and over 7,000 shares of preferred stock in G.B. Holding Corporation, which owns all shares of Glosser Bros., Inc. The total interest held by Bear Stearns is approximately twenty-one percent (21%). Additionally, two (2) officers of Bears Stearns are members of the Boards of Directors for both Debtors.

Bear Stearns had previously been the investment banker for both Debtors.

The U.S. Trustee asserts that these factors fly directly in the face of the Congressional mandate against employment of professionals who possess an adverse interest to the estate or are not "disinterested", as defined in 11 U.S.C. § 101(13):

(13) "disinterested person" means person that—

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason ...

Bear Stearns originally made no attempt to rectify their incontrovertible conflicts of interest. Only after the U.S. Trustee voiced unequivocal opposition did applicant-to-be-counsel to the Unsecured Creditors' Committee offer suggestions to mollify the objections. Said "olive branches" were to be received in writing on Monday, June 5, 1989; to date of this writing, the written changes have not been received. Based upon the oral representation at the hearing on this application, we believe Bear Stearns will seek to alleviate the conflicts as follows:

(1) Bear Stearns asserts that the schedules filed with this Court *under penalty of perjury* are in error, and that the corporation itself does not own Debtors' stock. It is averred that various partners, both active and retired, received said shares when Bear Stearns, acting as investment bankers, engineered Debtors' leveraged buyout in 1985. Bear Stearns plans to have all employee stock holders, numbering nearly one hundred, execute an irrevocable proxy statement to remove any possibility of direct control of the Debtors from Bear Stearns. These shares would be handled by a trustee, as yet unnamed, pursuant to the Trust, as yet not detailed.

(2) Bear Stearns' employees would resign from Debtors' Boards of Directors upon this Court's grant of the appointment, to further remove Bear Stearns from any direct position of control.

(3) Bear Stearns asserts that it has undertaken internal precautions to protect its newly-found disinterested status. Specifically, all Bear Stearns' employees have been or will be advised of the potential for conflict and a "chinese wall" is being or will be "erected" around the team of professionals which will be associated with the Debtors' proceedings.

All of these actions are facially proper, and we acknowledge the effort to create an arm's length relationship where previously the parties were joined at the shoulder. However, we believe that this proposal is essentially a machination to avoid the clear message of the statute.

At least one court has recently held that the Congressional mandate that equity security holders cannot be disinterested includes no restrictions based upon the exercise of control. *In re Intech Capital Corp.*, 87 B.R. 232 (Bankr.D.Conn.1988). The fact that Bear Stearns' employees will not vote their stock does not mean that they no longer have an interest in its condition, nor does it mean that they cannot try

to control the Debtors from a position "off-stage".

While we do not mean to impugn the integrity of Bear Stearns, we would be remiss if we did not point out that as equity holders they sit at the lowest end of the priority list regarding distributions from the estates. In order to recover *any* financial worth, Debtors' sale would need to generate sufficient sums to pay all creditors one hundred percent (100%). Even then, the equity holders would only receive a *pro rata* distribution. In contradistinction, professionals lead the priority parade, and in Bear Stearns' case, would receive a substantial pre-payment of $250,000.00 and a handsome monthly retainer in advance of services rendered.

Regarding Bear Stearns' "chinese wall", we admit to being less than confident that this wall is either impenetrable or capable of being monitored by the Creditors' Committee and this Court from a five hundred (500) mile distance. To the contrary, given the recent history regarding other investment bankers, we question the prophylactic quality of this creation. Bear Stearns is too close to the situation to ensure the avoidance of impropriety, and we are too far removed from Bear Stearns to assure it. At the very least, there is the appearance of impropriety.

A major treatise has described "disinterestedness" as follows:

> It appears broad enough to include anyone who in the slightest degree might have some interest or relationship that would color the independent and impartial attitude by the Code.... Indirect or remote associations or affiliations, as well as direct, may engender conflicting loyalties.

*2 Collier on Bankruptcy* ¶ 327.03 p. 327–30, 31 (1989) and cases cited within. *See also, Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249 (5th Cir.1986). Even if the above conflicts could be resolved to the satisfaction of this Court, we have substantial reservations regarding the terms and conditions of employment in relation to its impact on the estate. Bear Stearns provid-

ed this Court with a list of the services which it plans to render. They include:

(1) underwriting new financing;

(2) disposing of core assets;

(3) negotiating the plan of reorganization;

(4) resolving disputed claims and related litigation;

(5) evaluating and implementing financial strategies;

(6) controlling budget and inventory;

(7) providing valuation analyses;

(8) offering expert testimony regarding financial matters; and

(9) engaging in miscellaneous banking and financial services.

We are hard-pressed to understand the need for Bear Stearns to perform all of these services. An investment banker is traditionally an underwriter of new issues of securities, which acts as an intermediary between the issuing corporation and the public. *Black's Law Dictionary*, 5th ed. 1979. That definition is subsumed by item (1) on Bear Stearns' list. Items (2) through (4) are or should be within the realm of Debtors' counsel. If that firm is unable to bring sales, create and negotiate a Plan of Reorganization, and litigate claims, it has no business holding itself out to this Court as an experienced and capable bankruptcy firm. However, as we know from previous experience, Debtors' counsel is a highly experienced and well-respected firm specializing in bankruptcy law; we are certain they can manage those legal activities without the assistance of Bear Stearns' legal staff.

The remaining items on Bear Stearns' list of services fall under the auspices of the accountant and/or appraiser. Debtors have asked us to approve the employment of accountants, whom we will be approving with caveats. Coopers & Lybrand is not a one-man operation; it is a "Big 8" national accounting firm which employs "workout" and bankruptcy specialists as part of its team. In point of fact, Coopers & Lybrand have asked to be appointed as accountants *and* "bankruptcy advisors". Debtors cannot envelope themselves with duplicative

advisors at the expense of these estates. In this Court's estimation, if an investment banker is needed at all, it should be hired for the specific and limited purpose of issuing securities.

The proposed retention of Bear Stearns would create a financial fiasco for the Debtors and provide Bear Stearns with a ludicrous indemnification package. Under the terms of the proposed agreement, Bear Stearns would receive a monthly retainer of $50,000.00. Debtors generously advanced $250,000.00 to Bear Stearns prepetition, which would be credited against the first five (5) months of service. Debtors would also be responsible to reimburse Bear Stearns for its monthly out-of-pocket expenses. Interestingly, those expenses include their counsel fees and expenses. Apparently no one but the U.S. Trustee deems it advisable for this Court to fulfill its mandate by reviewing those fee petitions prior to allowing same to be paid by the estate.

Bear Stearns would have the exclusive right to handle all sales with values in excess of $1 million, and would receive minimum fees of $150,000.00 per sale. The minimum fee also applies to any sales with values under $1 million. Conceivably, Bear Stearns could bring a sale of certain assets with a value of $150,000.00, and because of costs associated with same, including the fee, this estate would *lose money*!

Bear Stearns' actual fees above the "floor" minimum are to be based upon a percentage of the transaction value, as opposed to the asset value. They would receive one and one-half percent (1½%) of the value of any sale up to $55 million. On values in excess of $55 million, Bear Stearns would collect three percent (3%). These fees do not include charges resulting from new financing procured under Bear Stearns' additional exclusivity clause. They seek their "customary" fee for said service; we have no idea what that fee would·be. Additionally, Bear Stearns asserts entitlement to its *full* fee on any transaction in which it played *any* part, if said sale is consummated within twenty-four (24) months of the termination of its employment.

These fees are not the most egregious of Bear Stearns' sins, although they are substantial. Even more appalling is their effort to create a hold harmless "heaven" against damages which they unintentionally cause the Debtors. The indemnification clause under which we expect they will seek to operate states that Bear Stearns will not be liable for damages caused by any of their actions, unless a court, not subject to further appeal, renders a judgment against them on the basis of "gross negligence" or "willful misconduct". Apparently Bear Stearns will accept responsibility for intentional torts and gross negligence, but seeks protection against "run-of-the-mill" negligence. Not only do they seek to be indemnified, they also intend to limit their liability in the case of gross negligence or willful misconduct to a disgorgement of fees previously received. Apparently any loss as a result of Bear Stearns' gross negligence and/or willful misconduct, over and above the fees paid, must be borne by Debtors.

The entire agreement bears all the signs of an "adhesion" contract. Debtors seem to lack any bargaining power as to these terms and conditions. Although applicant-to-be counsel to the Committee of Unsecured Creditors made some minor rumblings regarding certain of the above-referenced financial terms and the indemnification clause, and although we have been promised revised language and terms, we have not received same to this time.

Debtors' counsel opines that as Bear Stearns was employed approximately four (4) months prepetition, that critical time would be lost and additional expense would be incurred if Debtors had to begin fresh with a new investment banking firm. Frankly, we are not persuaded that an investment banker is necessary in this case. At most, such an entity would be needed to underwrite new financing, and by Debtors' own admission, there will be no classical "reorganization"; rather, Debtors will probably be sold to or merged with another entity. Additionally, we note that efficien-

cy is not specifically listed in the statute as part of the consideration in appointing professionals. As one court has so eloquently stated:

> With respect to the question of efficiency, it is by now plain that Congress, when it enacted § 327(a), made a choice that efficiency would be sacrificed for the appearance of propriety.

*In re Gray*, 64 B.R. 505 (Bankr.E.D.Mich. 1986).

Bear Stearns has known from the outset that certain categorical conflicts existed, and knew that their application might very well be denied. If they performed prior to Court approval, they took a calculated risk. This time the circumstances require the denial of their application, and the return of the $250,000.00 retainer. Additionally, Bear Stearns must account for and return any "out-of-pocket" reimbursements and all other fees or receipts to the estates.

### B. *Kirkpatrick & Lockhart*

■ Kirkpatrick has represented the Debtors for a number of years in the capacity of general corporate counsel, as well as having handled various and sundry related matters. However, Kirkpatrick has also represented a number of Debtors' various creditors, and therefore felt it inappropriate to seek appointment as general bankruptcy counsel. Kirkpatrick presently seeks to serve as Debtors' general corporate counsel, and to handle other non-bankruptcy matters on an "as needed" basis.

Kirkpatrick is a well known law firm with an outstanding national prominence. We favor them as counsel in most cases because they have built a reputation in this Court for sophistication and quality in the services they render. Having so stated, we are perplexed by the request to have Debtors represented by two law firms of such local and/or national esteem. When this Court approved the application of Debtors' present counsel, we inquired, given the size of this case and the relative size of counsel's firm, if they could manage it. They unequivocally answered in the affirmative, and we agreed to appoint them. To have two high-powered law firms representing the Debtors appears inappropriate.

We will not foreclose Kirkpatrick's representation on an "as needed" basis. If, for example, their services are needed for certain specific issues or cases, Debtors may seek Kirkpatrick's appointment, and they will be reconsidered. At present, however, Kirkpatrick's general application is denied and they are directed to account for and return any retainer received from the Debtors to these estates.

### C. *Coopers & Lybrand*

■ Coopers & Lybrand has been actively representing Debtors for approximately seven (7) years. There is no indication that they have previously or do presently represent any adverse interests. They are in fact "disinterested". Coopers & Lybrand is a "Big 8" accounting firm which employs a staff of bankruptcy and "workout" specialists, as well as accountants and auditors. They are thoroughly capable of performing all of the duties of both accountant and bankruptcy advisor in an exemplary fashion.

We also note in approving their application, that Coopers & Lybrand seeks a rather handsome hourly rate; indeed, their scale is much higher than this Court regularly approves. They are served with notice that partners and managers should be asked to perform only the most sophisticated duties. All fee petitions will be closely scrutinized for appropriateness of employee utilization, as well as those items which are normally evaluated.

### D. *Klett, Lieber, Rooney & Schorling*

Klett Lieber seeks authorization to serve as counsel to the Committee of Unsecured Creditors. We admit to having reservations about their approval. These concerns have nothing to do with the firm's ability. The members of this firm who have appeared in this Court have developed a reputation of the highest quality. We are however, dismayed by their position regarding various professional applications, including Bear Stearns. Klett Lieber filed no answer or response until approximately twenty (20) hours before the hearing. Even then, their Response was not an objection, but rather was an effort to negotiate away the most

egregious improprieties and provide a conduit through which Bear Stearns' application could more easily slide. We are concerned that this activity is the result of the "make up" of the Committee: the majority of the members are lending institutions, some of which, along with Bear Stearns, aided in the Debtors' leveraged buyout in 1985. The present counsel may not be able to provide uninhibited protection to all of the general unsecured creditors. Additionally, the trade creditors, as opposed to the industrial banking unsecured creditors, have requested this Court to consider the appointment of a separate committee to protect their interests, and seek to appoint separate counsel.

A hearing on that motion is scheduled for July 11, 1989. Until that time, we will defer a decision on the appointment of Klett Lieber. They are served with notice that their continued representation is not guaranteed. Any fees they are presently generating may or may not be chargeable against the estate. They may be required to pursue same from the individual creditors which sought their appointment.

An appropriate Order will be issued.

### ORDER OF COURT

AND NOW at Pittsburgh in said District this 12th day of June, 1989 in accordance with the foregoing Memorandum Opinion of this date evenwith, it is hereby ORDERED, ADJUDGED and DECREED that:

(1) Debtors' Joint Motion To Appoint Bear, Stearns & Co. is DENIED;

(2) Debtors' Motions To Appoint Kirkpatrick & Lockhart, P.C. are DENIED;

(3) Debtors' Motions To Appoint Coopers & Lybrand are GRANTED; and

(4) The Committee of Unsecured Creditors' Motion To Appoint Klett, Lieber, Rooney & Schorling, P.C. is DEFERRED.